**RECORD NO. 13-1657**

In The

# United States Court of Appeals

### For The Third Circuit

## HORACE BRANCH,

*Plaintiff – Appellant*,

v.

## CINDY SWEENEY, Associate Administrator;
## THE ATTORNEY GENERAL OF
## THE STATE OF NEW JERSEY,

*Defendants – Appellees*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

## REPLY BRIEF OF APPELLANT

_____

**Sean E. Andrussier**
**DUKE UNIVERSITY SCHOOL OF LAW**
**Box 90360, 210 Science Drive**
**Durham, North Carolina  27708**
**(919) 613-7280**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

ARGUMENT ....................................................................................................1

    I.     The State Court Unreasonably Applied *Strickland* ...............................2

          A.     The State's Focus On The Plausibility Of The Defense
                 Is Misplaced, And Indeed The State's Logic Renders
                 The Prosecution's Theory Implausible .................................... 2

                 1.     Branch's Account Was Not Implausible .........................5

                 2.     Using The State's Implausibility Logic, The
                     State's Trial Theory Was Itself Implausible ...................7

          B.     The State Glosses Over The Credibility And
                 Inconsistency Problems Among Its Witnesses ....................... 9

          C.     Samee And Robinson Would Have Offered Testimony
                 Crucial To The Defense And So Their Testimony
                 Could Not Properly Be Characterized As Merely
                 Cumulative ......................................................................... 12

    II.    Because The PCR Court Unreasonably Applied *Strickland*
           Based On The Existing Record, An Evidentiary Hearing Is
           Available ...........................................................................................21

CONCLUSION ................................................................................................22

RULE 46.1 CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE,
AND TYPE STYLE REQUIREMENTS, AND WITH 3d Cir. LOCAL
APPELLATE RULE 31.1(c)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. Fulminante*,
499 U.S. 279 (1991)..........................................................................................3

*Commonwealth v. Santiago*,
855 A.2d 682 (Pa. 2004)................................................................................21

*Grant v. Lockett*,
709 F.3d 224 (3d Cir. 2013) ...............................................................13, 14, 21

*Moore v. Sec'y Penn. Dep't of Corr.*,
457 F. App'x 170 (3d Cir. 2012).....................................................................15

*Rolan v. Vaughn*,
445 F.3d 671 (3d Cir. 2006) .....................................................................3, 4, 5

*Rolan v. Vaughn*,
No. Civ. A. 01-81, 2004 WL 2297407 (E.D. Pa. Oct. 12, 2004) ...................4

*State v. Branch*,
714 A.2d 918 (N.J. 1998) .......................................................................... 2-3

*Strickland v. Washington*,
466 U.S. 668 (1984)......................................................................2, 3, 9, 21

*United States v. Bergrin*,
682 F.3d 261 (3d Cir. 2012) ..........................................................................13

*United States v. Gray*,
878 F.2d 702 (3d Cir. 1989) ....................................................................13, 14

## STATUTE

28 U.S.C. § 2254(e)(2)...................................................................................22

# **ARGUMENT**

The central issue at trial concerned how Mosley was shot: Was he shot in crossfire between Pettie and Branch (the State's theory), or was he shot during a struggle over a single gun that Pettie pulled on an unarmed Branch (Branch's version)?  As the State acknowledges in its brief, part of that dispute concerns why Branch entered the hallway of 260 Prince Street: Did he enter to rob a group of drug dealers at gunpoint (the State's theory), or, instead, did he enter to ask for his $50 back after buying bad drugs, even though he was unarmed (Branch's version)?

In this appeal, the State's central argument is one of implausibility.  The State argues that it would have been absurd for Branch to try to get his money back from a drug dealer without being *armed*, Appellee Br. 15, 16, 21–22, 32, because it would have revealed a "cavalier disregard for safety and reason," *id.* at 35.  For Branch to enter the hallway *unarmed* with a hesitant Murphy, the State says, would have been so "inherently incredible," *id.* at 15, so "inherently preposterous," *id.* at 16, that Branch's testimony thereby lacked all credibility and left the jury with no choice but to disregard as "implausible" any testimony about an ensuing struggle between himself and Pettie over a single gun.  *See id.* at 32.

On the basis of this implausibility theory, which is an attack on Branch's credibility, the State concludes that *no* corroborating evidence could cause a jury to "change its mind as to the credibility of his story."  *Id.* at 35.  In other words, no

1

matter how many witnesses could have corroborated his account, the jury necessarily would have to accept, beyond a reasonable doubt, the "stick-up and crossfire" story peddled by the State's witnesses. Under this logic, defense counsel could have refused to call any witnesses—indeed, he could have failed to cross-examine the prosecution's witnesses—and it would not have mattered.

As explained below, the State's focus on the plausibility of the defense is misplaced. Also unavailing is the State's attempt to gloss over the weaknesses of its case. For these reasons, the State's argument that Samee and Robinson would have added no value is unpersuasive. So too is the State's new argument that these witnesses could have hurt Branch's defense. In the end, the PCR court unreasonably applied *Strickland* because Samee and Robinson were not cumulative witnesses. They were crucial witnesses for the defense.

## I.    The State Court Unreasonably Applied *Strickland*.

### A.    The State's Focus On The Plausibility Of The Defense Is Misplaced, And Indeed The State's Logic Renders The Prosecution's Theory Implausible.

The State argues that Branch's defense was implausible. But this was not the reasoning of the PCR court. A374. And the State's characterization of this case as a slam-dunk for the prosecution might come as a surprise to the New Jersey Supreme Court, which on direct appeal observed that the jury "[o]bviously [was] struggling" to render a verdict. *State v. Branch*, 714 A.2d 918, 923–24 (N.J.

1998).  The jury's questions to the judge revealed that jurors were seriously deliberating whether one or two guns were fired in the hallway—the competing versions of the incident.  *See* Opening Br. 16–17.  This indeed was a close case, one in which the perceived credibility of witnesses on both sides was paramount.  By arguing that Branch's account was unbelievable, the State has unwittingly made an even more compelling case for witnesses to corroborate Branch's account.  *See Arizona v. Fulminante*, 499 U.S. 279, 298–99 (1991) (evidence is not "merely cumulative" if it corroborates other evidence that is "unbelievable" on its own).

Before explaining why Branch's defense was not implausible, we first note that the State cites no authority for training the *Strickland* inquiry on the "credibility of [the defendant's] story."  Appellee Br. 35.  In fact, authority suggests otherwise.  *See Rolan v. Vaughn*, 445 F.3d 671 (3d Cir. 2006).

*Rolan* concerned the defendant's deadly shooting of a drug dealer in a building.  *Id.* at 674.  The prosecution claimed that the defendant entered the building armed with a shotgun, to rob drug dealers within.  *Id.*  The defense theory was self-defense: The defendant entered the building unarmed for a dispute with a drug dealer about the proceeds of a drug transaction; once the defendant was inside the building, a drug dealer charged the defendant with a knife, and the defendant "noticed a loaded rifle lying nearby, picked it up in time, and felled [the drug dealer] with a single shot."  *Id.*  That defense could be characterized as incredible

3

because it relied on the defendant's opportune discovery of a nearby, loaded rifle. Indeed, this Court stated, "[W]e marvel at Rolan's serendipitous rifle." *Id.* at 683. Nonetheless, this Court held that the defendant was prejudiced by counsel's failure to call two witnesses, because significant contradictions among the State's witnesses raised countervailing credibility issues for the jury to sort out. *See id.* In short, this Court's perception of the plausibility of the defendant's story—the serendipitous rifle—did not stop the Court from holding that the defendant was prejudiced by counsel's failure to call witnesses to support a theory of self-defense.

Moreover, while this Court marveled that the defendant serendipitously found a loaded rifle nearby, this Court did not marvel—as the State does in this appeal—at the notion that the defendant would have entered the building *unarmed* to confront a drug dealer about the proceeds of a drug transaction. Indeed, his unarmed entry was a key fact to which one of the uncalled witnesses (Vargas) would have testified. *See id.* at 682–83. Far from discrediting that testimony for being inherently implausible, this Court held that Vargas's testimony of an unarmed entry would have "bolstered" the defense and "undermined the prosecution's claims of a pre-meditated murder during a robbery." *Id.* at 683; *see also Rolan v. Vaughn*, No. Civ. A. 01-81, 2004 WL 2297407, at *14 (E.D. Pa. Oct. 12, 2004) (noting that one of the "most important[]" aspects of Vargas's testimony was that "Rolan was unarmed" when he entered the building; Vargas's testimony

4

shed light on "key contradictions of the prosecution's main witnesses," including "whether Rolan entered the house with a gun").  Had this Court applied the implausibility logic that the State is pushing in this appeal, *Rolan* presumably would have been decided differently: The Court presumably would have held that counsel's failure to call Vargas could not have prejudiced the defendant because the notion that Rolan would have entered the building *unarmed* to dispute money with a drug dealer would have been so preposterous that no rational juror could believe the defense account.

As explained below, Branch's version was not implausible.  And if this Court were to wade into questions of plausibility, the Court would have to evaluate plausibility on *both* sides of the ledger—not only Branch's version, but also the State's "stick-up and crossfire" story.  By the same implausibility logic the State uses to criticize Branch's account, the State's case below was exceedingly more implausible.

## 1.    Branch's Account Was Not Implausible.

The State deems it incredible for "a savvy drug user" like Branch to purposefully enter a "drug-den" *unarmed* because he would know that dealers inside would themselves be armed.  Appellee Br. 36.  But by advancing this argument, the State does precisely what the prosecutor urged the jury not to do when evaluating the credibility of the State's witnesses: The prosecutor

5

emphasized that these characters "live in a world that is very separate and distinct from the world that we live in and their system is very different than the system we live by," and she therefore urged jurors not to "judge this case and the witnesses' actions by your own standards." A303.

The same caveat applies to Branch. Yet the State ridicules Branch's response when the prosecutor asked him why, given the "type of neighborhood" he was in, Branch would risk danger by "entering a small hallway" containing "eight to ten" likely armed drug dealers. A295. Branch replied that his actions would be understandable "[i]f you know the nature of the blackman moving around the society of drugs, but, obviously, you don't understand that." A295. The State characterizes this as an "inane" response. *See* Appellee Br. 21. But Branch's answer, while it could have been worded differently, was hardly inane. He lived in a community of drug users and dealers, whom he knew and interacted with routinely, as he himself was a drug user from the streets and projects of Newark. *See* A260–62. It would not be irrational for someone in his shoes to go see the dealer who sold him bad drugs, even if unarmed.

In fact, another defense witness, Michael Davis, testified on cross-examination that he did what Branch did: On the morning of the incident, Davis bought bad cocaine from Pettie, and so he returned to Pettie's drug-den "[t]o see her about that." A237. No evidence showed that Davis was armed.

6

**2.     Using The State's Implausibility Logic, The State's Trial Theory Was Itself Implausible.**

If we are going to judge the plausibility of trial theories on the basis of a "cavalier disregard for safety and reason," Appellee Br. 35, the State's theory of the case was far less plausible than Branch's.  Indeed, the State's "stick-up and crossfire" theory involved a cavalier disregard for safety and reason three times over—by Branch, Pettie, and Mosley.

First, in the State's theory, Branch decided to enter a drug-den to rob dangerous drug dealers, despite expecting them to be armed.  Such a move would be fraught with peril.  Indeed, Branch was a drug user in that same community and he frequented that area.  *See* A73–74 (Murphy testifying that for years he saw Branch around the Prince Street projects three to four days a week).  So the State's theory had Branch conducting an armed robbery of dangerous people whom Branch likely would encounter in the future and who might track him down later.  This would display a far more cavalier disregard for safety and reason than Branch's own account in which he asked for his $50 back immediately after buying bad drugs.  By the State's own standard of plausibility, therefore, the armed robbery story was preposterous.

Second, in the State's version of the shooting incident, Pettie showed a cavalier disregard for safety and reason when (as she testified) she drew a small .38-caliber revolver and started a shootout in an enclosed and crowded hallway

7

with an armed man brandishing a semi-automatic weapon.  A151, A154, A198.

Pettie had nowhere to take cover, so the return fire easily could have killed her.

*See* A311 (prosecutor arguing that the victim of Branch's purported return fire

could have easily been Pettie were it not Mosley).

Third, Pettie's story about Mosley's inexplicable return to the hallway was

incredible.  According to Pettie, during the alleged armed robbery, Branch fired a

warning shot, which prompted Mosley to flee the hallway by running out the door.

A149–50.  But, Pettie said, Mosley then returned to the scene of the armed

robbery—from which he had just successfully escaped—and walked into the

purported crossfire.  *See* A160 ("[Branch] shot back.  Madee [Mosley] was coming

in the door at the time.").  In this version of the story, Mosley inexplicably decided

to expose himself to danger by voluntarily reentering a dangerous hallway where

an armed robber was brandishing a powerful gun which he had already fired.

In sum, if we are going to judge the plausibility of trial theories based on

actors cavalierly disregarding safety and reason, the State has quite a problem.

Under that standard, the State's "stick-up and crossfire" theory was preposterous.

And it was a story peddled by a band of drug dealers who not only suffered from

severe credibility problems, but who also had a motive to pin the shooting on

Branch—to protect Pettie.  *See* Opening Br. 45.  Right after the shooting, Pettie

made sure to discuss the incident with each of them before they talked to the

8

police.  A101, A105–06, A152–53, A216.  In a swearing match between the two sides over what happened that morning, the addition of an eyewitness (Samee) and key impeachment witness (Robinson) would have made it reasonably probable that at least one juror would have found that the State failed to prove its "stick-up and crossfire" story beyond a reasonable doubt.

### B.    The State Glosses Over The Credibility And Inconsistency Problems Among Its Witnesses.

The State does not contend that the PCR court considered the weakness of the State's case, and in particular the problems with its witnesses.  *See* Opening Br. 43–44 (discussing some of the inconsistencies among the State's witnesses).  But in applying *Strickland*, a court must consider the totality of the evidence, including weaknesses of the prosecution's case and witnesses.  *Id.* at 39–40.

The State claims its "case was not weak" because its witnesses had no "contradiction with regard to the major element of Branch carrying the weapon to the scene, walking into the drug den and using it."  Appellee Br. 32.  But this glosses over their major contradictions about the events in question, as well as evidence that Pettie coordinated with the State's other witnesses right after the incident, before they spoke to the police.  That they could agree that Branch was conducting an armed robbery when Mosley was shot, but disagree on much else, lends credence to the contention that the witnesses colluded to pin the shooting on

Branch by concocting a story about a stick-up, but without hammering out the details about how the incident transpired.

The State's reference to physical evidence is unavailing. The State's witnesses testified contrary to physical evidence at the murder scene.[1] Pettie testified that before Branch allegedly returned fire twice at her—the two bullets that hit Mosley—Branch had fired a "warning" shot. A149. That third shot would have produced a third shell casing. But police recovered only two shells from the 9mm gun.[2] A183, A200. Moreover, Pettie and Dortch testified that Pettie fired twice at Branch in the hallway. A119, A151. But no bullet strikes from Pettie's revolver or from Branch's "warning" shot were found. A329. (This omission evidently was not lost on the jury, which sent a note to the judge during deliberations asking, "Did they [police] find the bullets strike anywhere?" A323. The judge answered no. A329.) Evidence of two 9mm shell casings and two 9mm bullet strikes to Mosley is consistent with a total of *two* shots fired from a 9mm

---

[1] The State did not produce any fingerprint evidence concerning the magazine of the 9mm gun, or the eight cartridges that remained within it. *See* A203 (ballistics expert testifying he does not analyze fingerprints); *see also* D.E. 16-1, at 68 (Nov. 7, 1994) (same expert testifying that the gun had no traces of fingerprint powder).

[2] The State asserts that three casings were recovered, Appellee Br. 7, but we assume the State has inadvertently mistaken three photographs of the two shell casings for three shell casings. *See* A184–85 (testimony about three photographs: S-21, S-22, and S-23). Only two shell casings were recovered, corresponding to the two bullets recovered from Mosley's body. A183, A201, A308.

gun in the same direction.  It contradicts the account of the State's witnesses—a *five-shot* shootout involving two guns of different calibers firing in opposite directions.

The State says the defense version—Pettie's semi-automatic gun discharging while Pettie and Branch were falling—is inconsistent with the medical examiner's testimony that the bullets hit Mosley straight on, one behind his knee and the other in his back.  *See* Appellee Br. 25 ("no downward or upward trajectory"); A144–45 (one shot pierced Mosley's lung); A146–47 (the other shot hit Mosley behind the knee).  But Mosley's wound pattern is not inconsistent with Branch's account. One wound to the lower right lung and another to the right knee is consistent with a gun held by someone falling to the ground.

Moreover, the State does not try to explain how, under its theory, Branch could have fired straight ahead at Mosley ("no angle to the shot," A307) when Mosley was shot in two different locations from the same 9mm gun, one high enough to pierce his lung, the other low enough to strike the back of his knee.  It is difficult to understand from what position a standing shooter could shoot someone both at the height of his lung and the height of knee, from a distance of no more than ten feet (the distance according to Pettie, *see* A166), without angling the weapon up or down.

11

In sum, the State's effort to gloss over the weakness of its case—just as the PCR court unreasonably did—is unavailing.  The prosecution's case was fragile and turned on the testimony of credibility-challenged witnesses who had a motive to protect Pettie.  The PCR court's failure to consider this was unreasonable.

### C.    Samee And Robinson Would Have Offered Testimony Crucial To The Defense And So Their Testimony Could Not Properly Be Characterized As Merely Cumulative.

Because the accounts of the shooting were hotly contested, with witnesses on each side offering competing versions, this case indeed was a swearing match which turned on the credibility of the witnesses.  The jury was presented with the "stick-up and crossfire" version offered by the prosecution witnesses, and Branch's account in which Pettie pulled *the* gun (a 9mm gun) on a drug buyer who was seeking his money back (Branch), causing a struggle during which Pettie's gun discharged.  If, as the State suggests, the case turned on the jury's assessment of the credibility of defense witnesses, the added value of Samee and Robinson was even more critical to tip the scale in favor of Branch.  They would have added significant weight to his side of the scale—bolstering Branch's credibility by corroborating his account, refuting the account of State witnesses, and revealing to the jury that the State's leadoff witness (Murphy) himself described the incident consistently with Branch's account shortly after the shooting.

12

The State continues to cling to an incorrect conception of "cumulativeness," ignoring the reality that "evidence should only be deemed cumulative when the evidence on one side is so full that no jury that rejected it would be likely to change its mind because of the introduction of the proffered evidence." *United States v. Bergrin*, 682 F.3d 261, 280 n.23 (3d Cir. 2012) (internal quotation marks omitted). In a case turning on witness credibility, additional witnesses who corroborate one side or impeach the other side on a central and hotly contested issue are *not* cumulative. *See* Opening Br. 33–39. Two eyewitnesses concurring on a central issue carries more weight (more credibility) than the testimony of a single eyewitness. *See Grant v. Lockett*, 709 F.3d 224, 239 (3d Cir. 2013) ("It is hard to understand how having a *third* eyewitness testify that the defendant was not the shooter would have been 'cumulative' and therefore inconsequential[.]"); *United States v. Gray*, 878 F.2d 702, 713–14 (3d Cir. 1989) (concluding that an additional witness, even though interested, would have enhanced the credibility of defense witnesses and thus not have been cumulative). The State presumably knows this, because it called multiple eyewitnesses for *its* side, rather than relying on one.

The opening brief cited cases finding ineffective assistance of counsel based on the failure to call additional witnesses to a "swearing match." Appellee Br. at 37–38. The State attempts to distinguish these cases on the basis that many

13

concerned alibi or identification witnesses. *Id.* at 33–34. But those distinctions ignore the relevant *principle* from these cases: When a central factual issue is hotly contested, additional witnesses are simply not cumulative. Additional witnesses not only can add a different perspective; they can tip the scales for the defense through the power of corroboration and by impeaching the credibility of prosecution witnesses. This is true whether they are alibi witnesses establishing that the defendant was not at the scene, or whether, as in *Grant*, they are eyewitnesses identifying a shooter, or whether, as in *Gray* and this case, they are eyewitnesses explaining how the defendant acquired the gun he was caught with.

The State does not seem to deny that Samee would have corroborated Branch's account that he bought bad drugs; that he entered the hallway to ask for his money back; that Pettie pulled a gun on him; that her gun discharged, shooting Mosley; and that Branch acquired the gun in the course of that incident. Nor does the State address the unique information that Samee would have added. *See* Opening Br. 29–30. Samee could have testified about the type of gun Pettie pulled: a 9mm gun. This is hardly insignificant. The prosecutor made sure to elicit testimony from the State's witnesses about the caliber of gun Branch purportedly pulled, *see* A157 (Pettie); A116 (Dortch); A76 (Murphy), while Pettie and her confederates testified that Pettie pulled a .38-caliber gun, *see* A154 (Pettie); A97 (Murphy), or a "little" gun, A129 (Dortch). In a trial focusing in part on the caliber

14

of guns, it surely would have been significant for Samee to testify that, no, Pettie pulled a 9mm gun—*the* 9mm gun.  Davis and Barnhill did not testify to that. Moreover, Samee was the only witness who could have explained how Pettie got a second gun—a .38-caliber revolver—which she fired in the street after Mosley was shot.  *See* Opening Br. 29–30.

The State argues that "Robinson was inconsequential" because he was not an eyewitness, but instead was an impeachment witness against Murphy.  Appellee Br. 15.  But Murphy was a key prosecution witness, so his impeachment certainly would have been consequential.  *See Moore v. Sec'y Penn. Dep't of Corr.*, 457 F. App'x 170, 182 (3d Cir. 2012) (holding that counsel was deficient in failing to impeach one of the prosecution's three eyewitnesses with a prior inconsistent statement: "Counsel's failure to introduce evidence that contradicts a key witness's trial testimony is patently unreasonable").  And, significantly, the substance of the impeachment concerned no collateral matter: Robinson would have revealed to the jury that, on the day of the incident, Murphy gave an account of the shooting that *was consistent with the defense version*—the version the State argues to this Court was implausible.  Adding Robinson's testimony to Barnhill's would have been powerful: The jury would have heard that, right after the incident, *two* prosecution witnesses (Pettie and Murphy) reported accounts consistent with Branch's.  This

15

would have provided compelling support for the contention that the prosecution's witnesses had concocted the stick-up story to pin the shooting on Branch.

The State says the uncalled witnesses could not add value unless they could "explain why Branch entered the hallway unarmed or why Murphy would willingly accompany him." Appellee Br. 35. But Samee would have testified that Branch entered to get his money back because he bought bad drugs, and Robinson would have presented Murphy's statement corroborating this. Insofar as the State is suggesting that the witnesses needed to testify *why* Branch and Murphy were not as fearful as the State believes they should have been, the State cites no support for this proposition. Fact witnesses need not be expert witnesses on community custom or psychology. Otherwise the prosecution's witnesses were no good because they could not testify, for example, *why* Branch would expose himself to peril by trying to rob drug dealers in their drug den, or *why* Mosley would reenter the dangerous scene of an armed robbery after having just successfully escaped.

The State says that "defense counsel called two promising witnesses to the stand, one of whom [Davis] even corroborated the sale of 'beat' drugs by Pettie." Appellee Br. 36–37. The statement is offered to project some sort of strategy onto defense counsel. But this not only ignores the additional information that Samee and Robinson would have provided, it ignores this: Defense counsel did not even elicit that testimony from Davis about his buying drugs; that testimony came out

16

*only* during the prosecutor's cross-examination of Davis.  Neither the State nor the PCR court explains how defense counsel could have had a strategy to choose Davis as a superior witness for an issue on which defense counsel did not even examine Davis.  Defense counsel evidently had no idea that Davis could offer that testimony, raising questions about counsel's trial preparation, rather than vindicating any sort of strategy.

The State also says that Barnhill was "superior" because he had no relationship with Branch.  Appellee Br. 29.  But this use of "superior" compares apples to oranges.  Barnhill was a different type of witness than Samee, who was an *eyewitness*.  And Robinson's testimony addressed a topic unaddressed by Barnhill: *Murphy's* day-of-the-shooting account of the incident.  So the notion of Barnhill being a superior witness is perplexing.

The State's "superior witnesses" argument misses the point.  The issue is not whether Davis and Barnhill were somehow "better" than Samee and Robinson.  This is not an either/or question.  The issue concerns counsel's failure to call them as *additional* witnesses when they would testify about central and hotly contested issues in a swearing match between the two sides.

The State also contends that the testimony of Samee and Robinson might have undermined the defense theory by purportedly contradicting Branch's testimony.  The State never advanced these contradiction arguments in the PCR

17

proceeding or below.[3]  These arguments are not persuasive.  According to the

State, Samee's certification departs from Branch's testimony because Samee

portrays Branch as agitated or aggressive, and because Samee's certification has

Branch specifically addressing Pettie.  Appellee Br. 23–24.  But at trial, Branch

was never even asked, and never denied, whether he threw the vial of cocaine on

the floor or told others in the hallway not to buy Pettie's beat cocaine.  So there is

no contradiction.  As for Samee's statement about Branch addressing Pettie, Samee

is not purporting to quote Branch, and so Samee's reference to the cocaine as

Pettie's may reflect Samee's knowledge that Pettie was the source of the cocaine.

Moreover, Samee's statement does not say that Branch referenced Pettie *before*

Pettie was identified to Branch.  *See* A263–64 (Branch testifying that he and Pettie

"start[ed] talking," as Branch was pointing to Murphy saying that he (Branch) had

given Murphy his money to buy the drugs).[4]

---

[3] *See* Da116 of the modified record adopted by this Court's Nov. 21, 2013 Order
(State's brief in PCR trial court); D.E. 19-1, at 39–40 (State's Appellate Division
brief); A356 (transcript of PCR hearing); D.E. 12, at 18–22 (district court).

[4] The State at one point refers to defense counsel's summation reference to
"suicide," and the State suggests that throwing down the cocaine vial down would
have been encompassed by counsel's "suicide" reference.  Appellee Br. 24.  But
defense counsel merely argued, "You're not gonna *bust in there with a gun* with
seven or eight people, *that's* suicide."  A301 (emphasis added); *see* Appellee Br.
24 (paraphrasing counsel's summation as arguing that entering the hallway
"*holding a gun* in an aggressive manner . . . would be 'suicide'" (emphasis
added)).  In other words, the *State's version* would have been "suicide."

In another effort to manufacture a conflict, the State points to Samee's statement that Pettie's 9mm gun fired when "Branch grab[bed] the gun to get it out of her hand." A344. The State says this undermines Branch's testimony that he grabbed the *wrist* of Pettie's gun-hand. It does not. Samee observed a struggle in which Branch was grabbing at Pettie's gun-hand. Samee does not say that Branch wrested the gun from Pettie and fired it of his own accord; instead, he reports that the gun discharged as Branch and Pettie struggled for it. A344; *accord* A346 (Robinson). At any rate, whether Samee saw Branch grab Pettie's gun during the struggle, or whether he was simply referring to Branch grabbing the hand holding the gun during the struggle, is inconsequential. In dispute at trial were two completely different versions of how Mosley was shot—one with two shooters, the other involving a struggle over a single gun. The key is Samee's corroboration that Mosley was shot as a result of struggle over a single gun—Pettie's 9mm gun— rather than caught in the crossfire of two shooters.

The State similarly tries to conjure a conflict between Branch's testimony and Robinson's affidavit. The affidavit says Branch grabbed Pettie's gun and "got the gun out of [Pettie's] hand," A346, and the State points to Branch's testimony that after he grabbed the wrist of Pettie's gun-hand, the gun dropped to the floor, where Branch grabbed it. The State concedes that Robinson's statement can be interpreted consistently with Branch's testimony: "he could have meant Branch

19

knocked or forced it out of her hand." Appellee Br. 24. At any rate, conjuring a conflict between Robinson's affidavit and Branch's testimony is pointless because Robinson was relaying what *Murphy* told him. The significance of Robinson's testimony is that *Murphy* gave an account to Robinson, on the day of the incident, that was at odds with the version Murphy gave at trial—i.e., at odds with the State's "stick-up and crossfire" theory. Regardless of what *Murphy* meant about grabbing the gun—e.g., whether he meant Branch dislodged the gun from Pettie's hand after the gun fired during the struggle—what matters is that Murphy, the State's leadoff witness, conveyed to Robinson an account consistent with Branch's and thus at odds with the State's. This testimony would have been crucial.

For these reasons, the State's newly minted inconsistency arguments are not persuasive. As noted, moreover, in dismissing the inconsistencies among its own witnesses, the State reasons that inconsistencies do not matter unless they go "to the major element of" one side's account of the incident. *See* Appellee Br. at 32 ("There was no weakness or contradiction with regard to the major element of Branch carrying the weapon to the scene, walking into the drug den and using it"). Using the State's own logic, any purported inconsistencies between defense witnesses would be inconsequential so long as their testimony is consistent with the crux of Branch's defense.

**II.  Because The PCR Court Unreasonably Applied *Strickland* Based On The Existing Record, An Evidentiary Hearing Is Available.**

The State argues that the Court's discretion to permit an evidentiary hearing is constrained because, the State contends, Branch has not presented a *prima facie* claim for ineffective assistance of counsel.  Appellee Br. at 38, 40.  The State's argument here appears to be largely a reprise of its argument on the merits of the ineffective-assistance claim, particularly its argument that Branch was not prejudiced, based on the State's steadfast contention that the witnesses' testimony was "merely cumulative."  *See id.* at 40.  We have advanced our contrary argument on the merits, and we will not repeat it here.

The State "parenthetically" cites a Pennsylvania state court decision for the proposition that a petitioner must establish that the uncalled witnesses were available at trial before an evidentiary hearing may be held.  *Id.* at 39.  But the standard used in that Pennsylvania case is the one that (as we noted in the Opening Brief at 50) "troubled" this Court in *Grant.  Compare Grant*, 709 F.3d at 239 n.10 (dicta) *with Commonwealth v. Santiago*, 855 A.2d 682, 699 (Pa. 2004).  In this case, moreover, the PCR court did not deny Branch an evidentiary hearing on the ground that witnesses may have been unavailable for trial.  That Samee and Robinson provided pretrial statements with contact information is more than sufficient to establish, *prima facie*, that they were ready, willing, and able to testify at trial.  *See* Opening Br. 50–51.

21

The State does not contend that Branch failed through a lack of diligence to develop the factual basis for his claim in state court so that 28 U.S.C. § 2254(e)(2) would bar an evidentiary hearing.  Branch has been diligent in trying to develop the factual basis for his claim in state court—starting nearly two decades ago with his first request for an evidentiary hearing on this issue, when his case was pending on direct appeal in the Appellate Division.  *See* Opening Br. 53–54.

## CONCLUSION

According to Branch, he "practically beged [sic]" his trial counsel to interview Samee and Robinson and call them at trial, but counsel failed to do so. Appl. for Certificate of Appealability App. 7, May 6, 2013, 3d Cir., ECF No. 7. The district court's judgment should be reversed and the case remanded for further proceedings on Branch's habeas petition.

Dated:  January 17, 2014          Respectfully submitted,

                                  s/ Sean E. Andrussier
                                  Sean E. Andrussier
                                  North Carolina Bar No. 25790
                                  DUKE UNIVERSITY SCHOOL OF LAW
                                  Box 90360, 210 Science Drive
                                  Durham, North Carolina 27708
                                  (919) 613-7280
                                  *Court-Appointed Counsel for Appellant*

On the brief:
  Phillip Barber
  Adam Garmezy
  Elyse Lyons
  *Students, Duke University School of Law*

22

## RULE 46.1 CERTIFICATION OF BAR MEMBERSHIP

Pursuant to 3d Cir. L.A.R. 46.1(e), I hereby certify that I am a member of

the bar of the United States Court of Appeals for the Third Circuit.

Dated:  January 17, 2014          s/ Sean E. Andrussier

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME, TYPEFACE, AND TYPE STYLE REQUIREMENTS, AND WITH 3d Cir. LOCAL APPELLATE RULE 31.1(c)

1.     This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(C) because the brief contains 5,464 words, as determined by the word-

count function of Microsoft Word 2010, excluding the parts of the brief exempted

by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

2012 in 14-point Times New Roman.

3.     This brief complies with 3d Cir. L.A.R. 31.1(c) because the text of

this electronic brief is identical to the paper copies being filed with this Court.

4.     I certify that a virus check has been performed on this electronic brief

using McAfee VirusScan Enterprise version 8.8 and that no virus was detected.

Dated:  January 17, 2014          s/ Sean E. Andrussier

## **CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Appellate Procedure 25(d), I hereby certify that

on this 17th day of January, 2014, the foregoing Reply Brief for Appellant was

electronically filed with the Clerk of Court for the United States Court of Appeals

for the Third Circuit using the CM/ECF System.  I also certify that I caused 7

paper copies to be delivered by UPS Ground Transportation, which will send

notice of such filing to the following registered CM/ECF users:

Service was accompanied on the following by the CM/ECF system:

> Sara A. Friedman, Esq.
> Special Deputy Attorney General
> Essex County Office of Prosecutor
> Room 358
> 50 West Market Street
> Essex County Veterans Courthouse
> Newark, NJ 07102-0000
> Email: Sara.Friedman@njecpo.org
> *Counsel for Appellee*

Dated:  January 17, 2014                    s/ Sean E. Andrussier